IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                                 No. CR 11-0125 RB

PILAR JUARÉZ-PARRA,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Mr. Juaréz's Motion for Compassionate Release, filed on August 17, 2020. (Doc. 186.) Having reviewed the motion, the record, and the applicable law, the Court finds the motion is well-taken and should be **granted**.

**I.**  **Background**

On July 11, 2011, Mr. Juaréz pled guilty to an eight-count indictment charging conspiracy to distribute 50 grams and more of methamphetamine; three counts of possession with intent to distribute 50 grams and more of methamphetamine; re-entry of a removed alien; felon in possession of a firearm and ammunition; carrying a firearm during and in relation to a drug trafficking crime; and alien in possession of a firearm. (*See* Docs. 49; 106.) On the same day, he also pled guilty to two counts in a separate criminal proceeding (conspiracy and distribution of 50 grams and more of methamphetamine). *See United States v. Juaréz-Parra*, 11cr0124 RB, Docs. 31; 80. The Court sentenced Mr. Juaréz to 168 months imprisonment, which it later reduced to 147 months pursuant to 18 U.S.C. § 3582(c)(2) based on a guideline sentencing range that had subsequently been lowered and made retroactive. (*See* Doc. 185; 11cr0124 Doc. 119.) Mr. Juaréz "has served the large majority of his sentence"—approximately 119 months or 81%. (*See* Doc. 189 at 6.) His projected release date is less than one year away, on June 17, 2021. (*See id.*)

Mr. Juaréz, who is housed at the private Moshannon Valley Correctional Institution, now moves the Court under 18 U.S.C. § 3582(c)(1)(A)(i) to grant him compassionate release due to the COVID-19 pandemic. (Doc. 186.)

## II.     Discussion

### A.     Mr. Juaréz presents an "extraordinary and compelling reason" for compassionate release.

Prior to the passage of the First Step Act, only the Director of the Bureau of Prisons (BOP) could file a motion for compassionate release. Section 603(b) of the First Step Act now provides that a sentencing court may modify a sentence either upon a motion of the Director of the BOP "or upon motion of the defendant after he has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on his behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility . . . ." 18 U.S.C. § 3582(c)(1)(A). Mr. Juaréz asserts, and the Government concedes, that he filed a request for compassionate release and has exhausted his administrative rights. (Docs. 186 at 4; 189 at 7 n.3; 189-5.)

Mr. Juaréz seeks compassionate release pursuant to § 3582(c)(1)(A)(i), which permits a sentencing court to grant such a motion where "extraordinary and compelling reasons warrant such a reduction" and the "reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . ." The Application Notes of the U.S. Sentencing Guidelines § 1B1.13 provide that "extraordinary and compelling reasons exist" where the defendant has certain medical conditions, where the defendant is at least 65 years old and meets other qualifying circumstances, where the defendant has qualifying family circumstances, or for "other reasons." *See* U.S. Sentencing Guidelines Manual § 1B1.13 app. §§ (1)(A)–(D). Mr. Juaréz's motion is properly considered under § (1)(D), other reasons.

Mr. Juaréz asserts that "extraordinary and compelling" circumstances exist due to the unprecedented COVID-19 pandemic, coupled with his underlying health conditions. (Doc. 186 at 1–5.) He argues that because of his medical conditions, he risks severe illness or death if he contracts COVID-19. (*See id.* at 1.) The Government secured medical records that establish Mr. Juaréz has diagnoses of type 2 diabetes, chronic obstructive pulmonary disease (COPD), morbid obesity, hypertension, and asthma. (*See* Docs. 189 at 7; 192[1] at 7, 129, 264, 406.) The CDC lists three of those medical conditions—COPD, obesity, and type 2 diabetes—as ones that represent an "increased risk for severe illness from COVID-19." People with Certain Medical Conditions, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (updated Sept. 11, 2020). His remaining two conditions—hypertension and asthma—are listed as ones that "might" present an increased risk of illness from COVID-19. *Id.*

The Government offers several arguments to persuade the Court that it should deny a sentence reduction. First, it argues that Mr. Juaréz's conditions are "under control" and he receives "appropriate medical care." (Doc. 189 at 7.) This largely seems to be the case. The Court notes, however, that at a recent medical visit, the provider stated that Mr. Juaréz's diabetes was uncontrolled. (*See* Doc. 192 at 234.) More importantly, the CDC states that individuals with these underlying conditions are at a greater risk; not only individuals with uncontrolled conditions. *See United States v. Hernandez*, No. CR 13-00511(1) JMS, 2020 WL 3453839, at *6 (D. Haw. June 24, 2020) (finding that even though an inmate's asthma and hypertension were "well-controlled by medication and treatment, he is among those identified by the CDC to have an elevated risk for complications from COVID-19").

---

[1] The medical records were attached as several different exhibits. (*See* Docs. 192-1–192-9.) For ease of reference, the Court will refer to the records as "Doc. 192" and will use the CM/ECF pagination, rather than the internal pagination.

Next the Government asserts, without citing to the record, that Mr. Juaréz "has a history of refusing treatment and medications. His complaints about potential exposure to COVID-19 and its negative effects are largely reduced by his failure to follow medical advice." (Doc. 189 at 12.) The Court has pored over the medical records and found several instances where Mr. Juaréz refused medical treatment. For example, in July 2020, he reported to the "pill line" and refused his medications, stating, "I don't think these are helping me." (*See* Doc. 192 at 197–98.) At a medical visit the next week, he told the medical provider that "he was tired of taking so many medications." (*Id.* at 195.) He apparently agreed to take his prescribed medications after that visit. (*See id.*) Several weeks later, there is a note that he refused his medications, but at a doctor's visit the day before, he reported that he was "sick all morning and vomiting blood." (*See id.* at 181–84.) While the Court has found a scattering of other refusals (*see*, *e.g.*, *id.* at 71 (refusing a "diet for health"), 75 (refusing a genital, rectal, and prostate exam), 226 (refusing lab work)), it would not characterize these refusals as habitual or as evidence of a lack of concern for his healthcare.

Finally, the Government describes the BOP's preventative measures to protect inmates from COVID-19 and asserts that it called Moshannon Valley and was informed that "there are no COVID cases . . . where Defendant is housed." (Doc. 189 at 2–5, 7.) Yet, whether the facility is taking preventative measures or "whether an individual . . . facility has reported a positive test is not dispositive, for several reasons." *United States v. Rountree*, No. 1:12-CR-0308 (LEK), 2020 WL 2610923, at *7 (N.D.N.Y. May 18, 2020). First, despite these measures, COVID-19 cases continue to rise in prisons. *See*, *e.g.*, Timothy Williams et al., *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. Times, June 16, 2020, https://nyti.ms/2RKGgSn; Chris Dall, *Studies spotlight high COVID-19 infection rate in US prisons*, CIDRAP, Aug. 21, 2020, https://www.cidrap.umn.edu/news-perspective/2020/08/studies-spotlight-high-covid-19-

infection-rate-us-prisons. Additionally, the Government itself has recognized the continued risk COVID-19 poses to inmates by expanding the circumstances under which inmates can qualify for home confinement due to the pandemic. *See* May 8, 2020 BOP Memorandum, https://prisonology.com/wp-content/uploads/2020/05/COVID-19-Hurwitz-Memo-and-BOP-guidance-2020-05-08.pdf.

Second, "BOP's self-reported numbers 'must be treated with great caution, as the BOP has so far only tested for COVID-19 those prisoners who seem to be sufficiently unhealthy as to be in need of possible hospitalization.'" *Rountree*, 2020 WL 2610923, at *7 (quoting *United States v. Haney*, 19-cr-541 (JSR), ––– F. Supp. 3d at –––, 2020 WL 1821988, at *6 (S.D.N.Y. Apr. 13, 2020); citing *United States v. Esparza*, No. 07-CR-294, 2020 WL 1696084, at *2 (D. Idaho Apr. 7, 2020) ("[T]esting inside prisons has been scant except for people who self-report symptoms—which means that statistics about the number of infections already in BOP facilities are largely meaningless.")). Even more concerning to the Court, there is no publicly accessible information regarding the testing rate in privately-managed prison facilities, as there is for other BOP facilities. *See* COVID-19 Coronavirus, https://www.bop.gov/coronavirus/ ("The inmate totals listed do not include inmates . . . being held in privately managed prisons.") (last visited Sept. 21, 2020); *see also* DOJ OIG Releases Reports of Remote Inspections of Federal BOP Contract Correctional Institutions Giles W. Dalby, Moshannon Valley, and McRae Examining Institutions' Response to the Coronavirus Pandemic, U.S. DOJ Office of the Inspector General, Aug. 31, 2020, https://oig.justice.gov/sites/default/files/2020-08/2020-08-31.pdf); May 11, 2020 letter, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/docs/private_prisons_covid_data.pdf (listing number of lab-confirmed positive COVID tests at privately-managed prisons as of that date).

Third, "even if [the facility] were testing for [and reporting cases of] COVID-19 consistently enough that its statistics could be relied upon, prison still poses a significant threat to individuals with health conditions like [Mr. Juaréz's] because they serve as incubators that accelerate the spread of the disease." *Rountree*, 2020 W 2610923, at *7 (citing *United States v. Skelos*, 15-CR-317 (KRV), 2020 WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020) ("Jails and prison are powder kegs for infection . . . [because] the COVID-19 virus spreads with uncommon and frightening speed in carceral settings."); *United States v. Sanchez*, No. 18-CR-140, 2020 WL 1933815, at *1 (D. Conn. Apr. 22, 2020) ("[C]orrectional and detention facilities present unique challenges for control of COVID-19 among incarcerated/detained persons, staff, and visitors . . . [because] recommended social distancing and hygiene precautions are more difficult to practice.")). Mr. Juaréz describes his living quarters at Moshannon Valley as a "pod"—"a day-room like structure equipped with" 36 double bunk beds that houses approximately 70 men. (Doc. 186 at 2.) He asserts that "social distancing is not possible[,]" and many of the inmates at the facility are not using face masks to limit the potential spread of COVID-19. (*Id.*) Were Moshannon Valley to have an outbreak, Mr. Juaréz would be hard-pressed to keep himself isolated.

Consequently, the Court is reluctant to wait for a publicized outbreak at Moshannon Valley before recognizing the danger posed to Mr. Juaréz given his many underlying medical conditions. The Government reminds the Court that § "3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a world-wide pandemic." (Doc. 189 at 11.) The Court agrees and has carefully considered Mr. Juaréz's multiple and serious underlying health conditions, the conditions of his pod, and the lack of public information about testing at Moshannon Valley. The Court's decision here is not a classification of COVID-19, by itself, as an

extraordinary and compelling reason for a sentence reduction under § 3582(c)(1)(A) (*see id.*), but only as one piece of the puzzle in considering a single inmate's unique circumstances.

The final piece of the puzzle at this juncture is the Government's contention that Mr. Juaréz fails to show extraordinary and compelling reasons because the BOP denied his request for a reduction. (*Id.* at 12–13.) In its response letter to his request, the Moshannon Valley Facility Administrator did not discuss Mr. Juaréz's underlying medical conditions in the face of the pandemic. (*See* Doc. 189-5 at 3.) Instead, the Administrator denied the request largely because Mr. Juaréz is "ineligible" under BOP guidelines based on his status as a deportable alien. (*See id.*) The Court is not so hamstrung.

In short, the Court finds that Mr. Juaréz has demonstrated extraordinary and compelling circumstances that merit a sentence reduction.

### B.    Other considerations weigh in favor of a sentence reduction.

In addition to finding that an extraordinary and compelling reason exists for a sentence reduction, § 1B1.13 directs courts to consider "the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable" and whether the defendant is "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S. Sentencing Guidelines § 1B1.13 & (2).

Section 3553 requires courts to "impose a sentence sufficient, but not greater than necessary," in consideration of the following factors:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed--
>    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>    (B) to afford adequate deterrence to criminal conduct;
>    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . ;
(5) any pertinent policy statement . . . issued by the Sentencing Commission . . . ;
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). Section 3142 requires courts to consider:

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
(2) the weight of the evidence against the person;
(3) the history and characteristics of the person, including--
  (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
  (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. . . .

18 U.S.C. § 3142(g). As the § 3142 factors overlap to an extent with those in § 3553, the Court will consider them together.

    The Government argues that Mr. Juaréz "would pose a danger to public safety if released" because of the nature of his crime: "distributing large amounts of methamphetamine in the community . . . after returning to the United States illegally and . . . illegally arming himself with a firearm he purchased from a gang member." (Doc. 189 at 13.) The Government contends that Mr. Juaréz's criminal history "shows that he has no inclination to change his criminal lifestyle." (*Id.*) The Presentence Investigation Report (PSR) reveals that Mr. Juaréz has two previous

convictions, both for illegal entry into the United States, resulting in a criminal history category of II. (PSR ¶¶ 97–99.) This history does not concern the Court as much as his conduct on the day of this arrest does. Agents performed a traffic stop on Mr. Juaréz's vehicle and found 1.32 kilograms of methamphetamine (or 910 grams of actual methamphetamine) and a firearm. (*See id.* ¶ 41.) In the car with Mr. Juaréz were his wife and four children. (*See id.* ¶¶ 41–43.) Exposing innocents to drugs and a firearm is inexcusable. It is the Court's fervent desire that Mr. Juaréz's ten years in prison have changed his heart, that he will protect his family from his former lifestyle and make an honest living.

Normally, the Court would focus on the types of courses and programming an inmate had completed while imprisoned. Other than an assertion that he has completed his GED and INEA (*see* Doc. 186 at 4), this information is not before the Court, as Mr. Juaréz filed his motion pro se and the Government was not asked to nor did it submit evidence of this type with its response. Instead, the fact that Mr. Juaréz has served such a large portion of his 147-month sentence weighs heavily in favor of a reduction. His time served is sufficient to meet "the original sentence's retributive, deterrent, and incapacitative purpose." *See United States v. Pena*, No. 15-CR-551 (AJN), 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020). Moreover, Mr. Juaréz's disciplinary record shows that while he has sustained several infractions, the most recent of which in 2017, they are largely non-violent. (*See* Doc. 189-4.)

The Government asserts that the "Court has no authority to direct BOP to place a defendant in home confinement." (Doc. 189 at 14.) While the Court agrees that it does not have authority under the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. 116-136, § 12003, to order BOP to release Mr. Juaréz to home confinement, it does have "authority to modify sentences in appropriate circumstances, pursuant to 18 U.S.C. § 3582(c)(1)(A)." *United*

9

*States v. Al-Jumail*, No. 12-20272, ⸺ F. Supp. 3d at ⸺, 2020 WL 2395224, at *7 (E.D. Mich. May 12, 2020) (citations omitted).

Mr. Juaréz has a detainer in place and upon his release, he will be taken into Immigration and Customs Enforcement custody for deportation to Mexico. (*See* Docs. 186 at 4; 189-5 at 4.) He asserts that he will live with family in Chihuahua, he will have medical insurance, and he will work in an agricultural family business. (Doc. 186 at 4.) The Court finds that it may grant compassionate release and order immediate release from BOP custody to ICE pursuant to the detainer. *See*, *e.g.*, *United States v. Ardila*, No. 3:03-CR-264 (SRU), 2020 WL 2097736, at *2 (D. Conn. May 1, 2020) (granting compassionate release to inmate due to pandemic and ordering immediate release to ICE custody "pursuant to [the inmate's] underlying detainer"); *United States v. Molina Acevedo*, No. 18 CR. 365 (LGS), 2020 WL 3182770, at *3 (S.D.N.Y. June 15, 2020) (finding that inmate was "not eligible for home confinement because he is subject to a[n ICE] detainer" but would have otherwise been a candidate and granting compassionate release due to pandemic and ordering immediate release to ICE custody for deportation).

Mr. Juaréz has served over 80% of his 147-month sentence. (*See* Doc. 189 at 6.) Considering good time credit, he has served approximately 93% of his term. (*Id.*). The Court finds that the sentence he has served thus far is adequate under § 3553(a), particularly in the face of this novel pandemic, "a risk that the Court did not anticipate and to which it certainly did not intend to expose Mr. [Juaréz] when it sentenced him . . . ." *See United States v. Lopez*, No. 18-CR-2846 MV, 2020 WL 2489746, at *4 (D.N.M. May 14, 2020). Accordingly, the Court will grant Mr. Juaréz's motion and reduce his sentence to time served pursuant to 18 U.S.C. § 3582(c)(1)(A).

**THEREFORE,**

**IT IS ORDERED** that the Motion for Compassionate Release (Doc. 186) is **GRANTED** and Mr. Juaréz's sentence is reduced to time served.

**IT IS FURTHER ORDERED** that Mr. Juaréz shall be released into the custody of ICE for removal to Mexico.

**IT IS FURTHER ORDERED** that the Motion to Appoint Counsel (Doc. 187) is **DENIED AS MOOT**.

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE